Sonjay Singh (*Pro Hac Vice*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (772) 783-8436
Email: ssingh@sirillp.com

Michael Connett (SBN #300314)
**SIRI & GLIMSTAD LLP**
700 S. Flower St., Ste. 1000
Los Angeles, CA 90017
Tel: 212-532-1091
Email : mconnett@sirillp.com

*Attorneys for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

M.S. AND C.P., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

AYLO GLOBAL ENTERTAINMENT, INC., AYLO USA INCORPORATED, AND TOQON, LLC D/B/A TRAFFICJUNKY,

Defendants.

Case No.: 25-cv-01139-DJC-JDP

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT OR TO COMPEL ARBITRATION**

Assigned to the Hon. Daniel J. Calabretta

Date: December 4, 2025
Time: 1:30 PM
Location: 501 I Street
Courtroom 7, 14th Floor
Sacramento, CA 95814

SAC Filed: May 23, 2025

Reply Date: October 30, 2025

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .......... 1
II. RELEVANT FACTUAL BACKGROUND .......... 2
A. The Parties .......... 2
B. Google's Tracking Tools .......... 3
III. LEGAL STANDARD .......... 4
IV. ARGUMENT .......... 4
A. THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS .......... 4
B. THE PURPORTED ARBITRATION CLAUSE CANNOT BE ENFORCED .......... 10
C. PLAINTIFFS DID NOT CONSENT TO DEFENDANTS' UNAUTHORIZED DISCLOSURE OF THEIR SENSITIVE INFORMATION. .......... 12
i. Defendants have not satisfied their burden to prove that the purported Privacy Notice exists .......... 12
ii. Even if Defendants can prove the purported Privacy Notice exists, it still fails to provide appropriate notice. .......... 13
iii. Even assuming *arguendo* that Plaintiffs agreed to the Privacy Notice, the Court still cannot conclude that Plaintiffs consented to Defendants' practices because the Privacy Notice does not actually disclose them. .......... 15
D. PLAINTIFFS' VPPA CLAIM IS WELL-PLED. .......... 16
i. Plaintiffs allege that Defendants disclosed their personally identifiable information. .......... 17
ii. Plaintiffs are consumers under the VPPA .......... 23
E. PLAINTIFFS DID NOT CONSENT TO DEFENDANTS' VIOLATIONS OF THE ECPA AND CIPA. .......... 26
F. PLAINTIFFS' INVASION OF PRIVACY CLAIM IS WELL-PLED. .......... 26
G. PLAINTIFFS' NEGLIGENCE CLAIM IS WELL-PLED .......... 27
H. UNJUST ENRICHMENT .......... 28
V. CONCLUSION .......... 29

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Ade v. Viki, Inc.*,
2024 U.S. Dist. LEXIS 79467 (N.D. Cal. Mar. 28, 2024) ........ 21

*In re Anthem Inc. Data Breach Litig.*,
2016 U.S. Dist. LEXIS 70594 (N.D. Cal. May 27, 2016) ........ 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 4

*C.M. v. MarinHealth Med. Grp., Inc.*,
2024 U.S. Dist. LEXIS 10189 (N.D. Cal. Jan. 19, 2024) ........ 28

*Cahill v. Liberty Mut. Ins. Co.*,
80 F.3d 336 (9th Cir. 1996) ........ 4

*Dawson v. Target Corp.*,
2025 U.S. Dist. LEXIS 111315 (N.D. Cal. June 11, 2025) ........ 11

*Doe v. Aylo Glob. Ent. Inc.*,
2025 U.S. Dist. LEXIS 150662 (C.D. Cal. Aug. 4, 2025) ........ 10

*Doe v. Aylo Holdings*,
2025 U.S. Dist. LEXIS 98282 (C.D. Cal. Feb. 24, 2025) ........ 5

*Doe v. Fullstory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ........ 27, 28

*Doe v. Regents of the Univ. of Cal.*,
672 F. Supp. 3d 813 (N.D. Cal. 2023) ........ 27

*Edwards v. Mubi, Inc.*,
773 F. Supp. 3d 868 (N.D. Cal. 2025) ........ 21

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ........ 17, 18, 19

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (Cal. 1997) ........ 10

*Fan v. NBA Props. Inc.*,
2024 U.S. Dist. LEXIS 57205 (N.D. Cal. Mar. 26, 2024) ........ 21

*Fleites v. Mindgeek S.A.R.L.*,
2022 U.S. Dist. LEXIS 174824 (C.D. Cal. July 29, 2022) ........ 10

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) ........ 28

*Garcia v. Bandai Namco Ent. Am. Inc.*,
2025 U.S. Dist. LEXIS 152616 (C.D. Cal. Aug. 7, 2025) ........ 21

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) ........ 24

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
328 F.3d 1122 (9th Cir. 2003) .......... 9
*Hernandez v. Hillsides*, Inc.,
47 Cal. 4th 272 (2009) .......... 27
*In re Hulu Privacy Litig.*,
2012 U.S. Dist. LEXIS 112916 (N.D. Cal. Aug. 10, 2012) .......... 24
*Jefferson v. Healthline Media, Inc.*,
674 F. Supp. 3d 760 (N.D. Cal. 2023) .......... 23
*Katz-Lacabe v. Oracle Am., Inc.*,
2023 U.S. Dist. LEXIS 178369 (N.D. Cal. Oct. 3, 2023) .......... 28
*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... 13
*Kilpatrick v. Texas & P. Ry.*,
72 F. Supp. 635 (S.D.N.Y. 1947) .......... 9
*Knappenberger v. City of Phoenix*,
566 F.3d 936 (9th Cir. 2009) .......... 4
*Krayzman v. Istockphoto LP*,
2024 U.S. Dist. LEXIS 181294 (N.D. Cal. Oct. 3, 2024) .......... 15
*Kuzenski v. Uproxx LLC*,
2023 U.S. Dist. LEXIS 211822 (C.D. Cal. Nov. 27, 2023) .......... 24
*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025) .......... 17
*Mason v. CreditAnswers, LLC*,
2008 U.S. Dist. LEXIS 68575 (S.D. Cal. Sept. 4, 2008) .......... 15
*McKee v. Audible, Inc.*,
2017 U.S. Dist. LEXIS 174278 (C.D. Cal. July 17, 2017) .......... 15
*Meyers v. Alphabet, Inc.*,
2022 U.S. Dist. LEXIS 98298 (C.D. Cal. Feb. 14, 2022) .......... 15
*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .......... 17
*Nguyen v. Elsevier Inc.*,
2025 U.S. Dist. LEXIS 109280 (N.D. Cal. June 9, 2025) .......... 22
*Perez v. Bath & Body Works, LLC*,
2022 U.S. Dist. LEXIS 15091 (N.D. Cal. Jan. 27, 2022) .......... 11
*Plotsker v. Envato Pty Ltd.,* No.
2025 U.S. Dist. LEXIS 168070 (C.D. Cal. Aug. 26, 2025) .......... 21
*Ramirez v. Trusper, Inc.*,
2024 U.S. Dist. LEXIS 186303 (N.D. Cal. Oct. 11, 2024) .......... 14, 15
*Rascon v. Checkcare Enters.*,
2006 U.S. Dist. LEXIS 56433 (N.D. Cal. Aug. 1, 2006) .......... 10

*Sellers v. Bleacher Report, Inc.*,
2023 U.S. Dist. LEXIS 131579 (N.D. Cal. July 28, 2023) ....................................... 21
*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444, 289 Cal. Rptr. 3d 1(2021) .......................................... 13, 14, 15
*Silver v. Stripe Inc.*,
2021 U.S. Dist. LEXIS 141090 (N.D. Cal. July 28, 2021).................................. 26, 27
*Snow v. Eventbrite, Inc.*,
2020 U.S. Dist. LEXIS 193249 (N.D. Cal. Oct. 19, 2020) ........................................ 11
*St. Aubin v. Carbon Health Techs., Inc.*,
2024 U.S. Dist. LEXIS 179067 (N.D. Cal. Oct. 1, 2024) .......................................... 27
*Steel v. United States*,
813 F.2d 1545 (9th Cir. 1987) ......................................................................................... 5
*Streedharan v. Stanley Indus. & Auto., LLC*,
2024 U.S. App. LEXIS 192 (9th Cir. Jan. 4, 2024)...................................................... 10
*Thomas v. Cricket Wireless LLC*,
2020 U.S. Dist. LEXIS 56272 (N.D. Cal. Mar. 31, 2020)............................................. 5
*Thornton v. Mindvalley, Inc.*,
2025 U.S. Dist. LEXIS 53202 (N.D. Cal. Feb. 14, 2025) .......................................... 21
*Wells Fargo & Co. v. Wells Fargo Express Co.,*
556 F.2d 406 (9th Cir. 1977) ........................................................................................... 9
*In re Yahoo! Inc. Customer Data Sec. Breach Litig*.,
2017 U.S. Dist. LEXIS 140212 (N.D. Cal. Aug. 30, 2017) ....................................... 29
*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016)........................................................................................... 20

## I. PRELIMINARY STATEMENT

A person's sexual desires are some of the most sensitive, personal things in life. As the Supreme Court has stated, an individual's sexual behavior within their own home represents the "most private human conduct…in the most private of places." Lawrence v. Texas, 539 U.S. 558, 567 (2003). For many Americans, their sexual lives in some way involve viewing pornography. But, despite its prevalence, pornography usage is still a topic that most individuals prefer not to discuss. As a result, the unwanted disclosure of such information can be enormously harmful, impacting an individual's reputation, livelihood, personal relationships, and mental wellbeing.

Plaintiffs utilized Defendants' Website to view pornography. Unfortunately, unbeknownst to Plaintiffs, Defendants were secretly tracking and disclosing Plaintiffs' interactions with the Website, including specific information about the videos they viewed and personally identifying information ("Sensitive Information"), Defendants compiled and disclosed Plaintiffs' Sensitive Information to third parties, including one of the largest advertisers in the world, Google. Indeed, Defendants installed advertising surveillance software offered by Google ("the Tracking Tools"), allowing Google to harvest the Sensitive Information of users for the purpose of targeted advertising.

In their Motion to Dismiss, Defendants do not challenge the fact that they collected and disclosed user information. Instead, Defendants argue that Plaintiffs were put on notice of Defendants' practices through the Terms of Service and Privacy Policy.

However, these documents do *not* disclose the complained of practices, and moreover, Defendants fail to even provide the operative documents along with their Motion to Dismiss.

Defendants also argue that Plaintiffs' claim under the Video Privacy Protection Act of 1988 ("VPPA") fails because Plaintiffs' allegations do not implicate any "personally identifying information" ("PII"). However, as explained below, Defendants disclose a wealth of information about Plaintiffs that can easily be used to identify them as well as the specific videos that they view.

Further, as explained herein, Plaintiffs statutory and common law claims are well-plead. Thus, Defendants' Motion to Dismiss should be denied.

## II. RELEVANT FACTUAL BACKGROUND

### A. The Parties

Defendants Aylo Global Entertainment, Inc. ("Aylo Global"), Aylo USA Incorporated ("Aylo USA"), and Toqon LLC ("Toqon, and together with Aylo Global and Aylo USA, "Defendants") operate PornHub. Pornhub is one of the most popular pornography destinations on the Internet. ECF No. 37 (the "SAC"), ¶ 5. It hosts a wide range of pornographic content including millions of pornographic videos. *Id*. It alone is the nineteenth most-visited website on the entire Internet, with its Website — www.pornhub.com (the "Website")— receiving *billions* of visits each year. *Id*.

**B. Google's Tracking Tools**

Google offers website operators access to their proprietary suites of marketing, advertising and customer analytics software. *Id*. ¶ 8. Armed with these programs, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited. *Id*. But, in exchange for access to this software, website operators must install Google's Tracking Tools on their website—third party surveillance software that captures sensitive, personally identifiable information provided to the website operator by its users. *Id*. ¶ 9. Google then aggregates the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected about a given user. *Id*. ¶ 64. With these advertising profiles, Google and Facebook can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or income, type of employment, use of specific apps or websites, and more). Id. Where an internet user has a Google account, this information can be correlated to their identity, through tracking cookies installed on the user's web browser. *Id*. ¶¶ 78-85.

## III. LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the burden of proof is on the movant, and the court draws all reasonable inferences in plaintiff's favor, assuming all well pleaded factual allegations to be true and determining whether they plausibly give rise to an entitlement to relief. *See, e.g., Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337– 38 (9th Cir. 1996). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that the plausibility standard demands more than "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement") (internal quotation marks omitted). Courts are instructed to freely grant leave to amend unless the defects identified could not possibly be cured. *See, e.g., Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## IV. ARGUMENT

### A. THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS

In December of 2023—notably *after* the Tracking Tools were installed on the Website and shortly *before* Plaintiffs registered for their accounts—Defendants changed their principal office locations from the same California address to the same Texas address. *See* Singh Decl. ¶¶ 11-13, Exs. 10-12; Singh Decl. ¶ 2, Ex. 1 (FTC complaint from September 2025 stating all of Defendants' principal places of business as "21800

Oxnard Street, Suite 150, Woodland Hills, California 91367"); *see also Doe v. Aylo Holdings*, No. 2:24-cv-03267-MCS-JPR, 2025 U.S. Dist. LEXIS 98282, at *10 (C.D. Cal. Feb. 24, 2025) (allegations that PornHub Website user data was shared with Google in violation of the VPPA as early as 2019). Thus, the Court has jurisdiction over Defendants because all business decisions relating to Defendants' use of the Tracking Tools on the Website were made in the state of California, at Defendants' then-headquarters. *See Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("one cannot defeat personal jurisdiction by a move away from the state in which the underlying events took place"); *Thomas v. Cricket Wireless LLC*, No. C 19-07270 WHA, 2020 U.S. Dist. LEXIS 56272, at *12 (N.D. Cal. Mar. 31, 2020) (finding jurisdiction proper where decisions relating to the action were made from defendant's prior California headquarters).

Defendants' entire argument to the contrary rests upon their self-serving, summary assertions that they have no involvement in the Website's operations. However, these assertions are not true for the reasons set forth herein.

***First***, they are contradicted by other self-serving statements made by Mr. Andrew Link, PornHub's Director, in the Declaration of Andrew Link in Support of Defendants' Motion to Dismiss the Second Amended Complaint or to Compel Arbitration. ECF No. 40-2 ("Link Declaration" or "Link Decl."), including the following:

- "Aylo Global Entertainment Inc. [] provides limited support services to other Aylo corporate entities." Link Decl., ¶ 7.
- "[T]wo of its employees have responsibilities concerning the content on Aylo sites." *Id*.
- "Toqon, LLC provided payment processing services in the United States for resales of memberships subscriptions related to certain Aylo business units." *Id*. ¶ 12. Yet, it does not explain which business units Toqon services.

***Second***, these assertions are contradicted by Defendants' own public statements. Just last month, the Federal Trade Commission ("FTC") and Utah Division of Consumer Protection filed a complaint against Defendants and other connected entities (together, the "Aylo Entities"), wherein public statements made by the Aylo Entities themselves were relied upon to conclude as follows:

> Defendants work jointly to carry out the business practices described below, namely owning and operating their adult-video websites, through an interrelated network of companies that have common control and ownership; shared officers, managers, employees, business functions, office space, and email systems; unified advertising; and commingled funds.

Singh Decl, Ex. 1 ¶ 32.[1]

[1] Other governmental entities have also concluded that Aylo (USA) and Aylo Global operate the Website. *See* Singh Decl. ¶ 3, Ex. 2 (complaint filed by Attorney General of Texas against Aylo (USA) and Aylo Global, and no other entity, regarding failure to prevent underage use of the Website).

Furthermore, relying on a 2019 presentation given by Defendants, the FTC found that, based on the Aylo Entities' own public statements, Defendants "provide[] day-to-day management services with respect to [the Aylo Entities'] operations" and "provide[] the workforce required to carry [out] certain [Aylo Entities'] functions including[] human resources, information technology, accounting and administration." *Id*. ¶ 51. The FTC went on to specifically note that Aylo Global employs Defendants' Director of Operations for Trust and Safety, an executive who lives in the United States and is responsible for content moderation on the Website. *Id*. ¶¶ 52-53. The FTC also found that the Aylo Entities are "under the common control of one Chief Executive Officer, Chief Operating Officer, Chief Product Officer, Chief Legal Officer, and Chief Financial Officer[;]" utilize a shared e-mail system; and "share[] over 1,600 employees worldwide, including over two dozen in the United States." *Id*. ¶ 45-46. All of these facts directly contradict Defendants' assertion that only Aylo Freesites Ltd. operates the Website.

And if these examples were not already enough, *additional* publicly available information shows Defendants' involvement with the Website's operations, including multiple Digital Millenium Copyright Act ("DMCA") takedown notices sent by Defendant Aylo (USA) to Google to protect its copyright over pornographic videos hosted online. *See* Singh Decl. ¶ 4, Exs. 3A-3G. Each of these notices clearly represents Aylo (USA) as the copyright holder, and one of the web properties controlled by the

Aylo Entities as the place where the original copyrighted material is hosted. *Id.*; Singh Decl., Ex. 1 ¶ 43 (list of Aylo-owned web properties).

Clearly, Aylo (USA) is not *only* involved in the sale of DVD merchandise, as Defendants' Motion claims, but is also a copyright holder in online video content, which it protects by issuing DMCA takedown notices to other websites hosting its content without permission.

And with regards to TrafficJunky, Defendant Toqon is listed on the footer banner of *every page* of the TrafficJunky website. *See* Singh Decl. ¶¶ 8-9, Exs. 7-8. Moreover, TrafficJunky has publicly and repeatedly represented itself as a Canadian company, not a Cypriot company as claimed by Defendants. *See id.* ¶¶ 8-10, Exs. 7-9. These representations span from when it was founded in 2008 (*id.* ¶ 9, Ex. 8) ("TrafficJunky is an innovative web advertising and digital marketing company founded in 2008 in Montreal, Canada"), to the year 2024 when Plaintiffs registered for the Website (*id.* ¶ 10, Ex. 9) (X post from official TrafficJunky account in July of 2024 stating "TrafficJunky is a Canadian company"), to current representations on the TrafficJunky website's careers page (*id.* ¶ 8, Ex. 7) ( "Canadian winters are long. Get the most out of your summer by leaving as early as 1PM on Fridays"). In short, TrafficJunky has never represented itself as a Cypriot company, instead always representing itself as a Canadian company. Indeed, a Canadian company known as "trafficjunky, inc." was created in 2011, before being amalgamated into "Trafficjunky Inc." in 2013, and then into

"4357337 CANADA INC." in 2015. *See id.* ¶¶ 5-7, Exs. 4-6. Thus, these facts directly contradict Defendants' assertion that TrafficJunky is operated by Aylo Freesites Ltd., a Cypriot company. *See* Mot. at 7:14-15.

In light of these many public statements by Defendants and the other Aylo Entities contradicting their assertion that only Aylo Freesites Ltd. operates the Website, the Court should find that Plaintiffs have satisfied their prima facie burden to establish personal jurisdiction.

In the alternative, Plaintiffs ask for jurisdictional discovery to evaluate the connections between Defendants and the Website. Jurisdictional discovery "'should be granted where pertinent facts bearing on the question of jurisdiction are controverted…or where a more satisfactory showing of the facts is necessary.'" *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 430 n.24 (9th Cir. 1977) (quoting *Kilpatrick v. Texas & P. Ry*., 72 F. Supp. 635, 638 (S.D.N.Y. 1947)). The Ninth Circuit has noted that a district court abuses its discretion where it denies a request for jurisdictional discovery where "[f]urther discovery…might well demonstrate facts sufficient to constitute a basis for jurisdiction." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003). Where a defendant supports its argument against a finding of jurisdiction through an affidavit, jurisdictional discovery is appropriate where the plaintiff demonstrates how further discovery would allow it to contradict the facts set forth in the affidavit. *Rascon v. Checkcare Enters.*, No. C 06-

0256 PJH, 2006 U.S. Dist. LEXIS 56433, at *8 (N.D. Cal. Aug. 1, 2006). Other courts in this Circuit have granted jurisdictional discovery when faced with the complex corporate web of the Aylo operation. *See Doe v. Aylo Glob. Ent. Inc.*, No. CV 23-07488-MWF (AGRx), 2025 U.S. Dist. LEXIS 150662, at *9 (C.D. Cal. Aug. 4, 2025); *Fleites v. Mindgeek S.A.R.L.*, No. LACV-21-04920-CJC-(ADSx), 2022 U.S. Dist. LEXIS 174824, at *12 (C.D. Cal. July 29, 2022).

Specifically, and if granted, Plaintiffs would request jurisdictional discovery as to the residence and responsibilities of Defendants' employees; agreements between Defendants and the other Aylo entities pertaining to the Website; financial information relating to funds held by Defendants with any connection to the Website; Defendants' and the Aylo Entities' common leadership structure; and any other information relating to any connections between the Website and Defendants.

### B. THE PURPORTED ARBITRATION CLAUSE CANNOT BE ENFORCED.

"In California, general principles of contract law determine whether the parties have entered a binding agreement to arbitrate." *Streedharan v. Stanley Indus. & Auto., LLC*, No. 22-55999, 2024 U.S. App. LEXIS 192, at *2 (9th Cir. Jan. 4, 2024). Pursuant to those principles, the "party seeking arbitration 'bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence[.]'" *Id.* (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951 (Cal. 1997)).

Defendants have failed to meet this burden. Plaintiffs allege that they registered for their Website accounts in 2024. SAC ¶¶ 18, 23. But, the Terms of Service that Defendants claim includes the relevant arbitration clause clearly states that it was "Last Modified: March 27, 2025"—***after*** Plaintiffs created their Website accounts in 2024. *Compare* ECF No. 28-3, at p. 1, *with id.*; *see also* Mot. at 16:26-17:3 (acknowledging that Plaintiffs first used Website in 2024). Defendants cannot satisfy their burden to show that an arbitration clause existed in 2024 by citing a document from 2025. *See Snow v. Eventbrite, Inc.*, No. 3:20-cv-03698-WHO, 2020 U.S. Dist. LEXIS 193249, at *15 (N.D. Cal. Oct. 19, 2020) ("[defendant] would only be able to carry its burden [to show an agreement to arbitrate] if it could show what the agreements looked like during the period when the plaintiffs would have actually seen them"); *Dawson v. Target Corp.*, No. 3:24-cv-08167-AMO, 2025 U.S. Dist. LEXIS 111315, at *5 (N.D. Cal. June 11, 2025) ("There is no evidence in the record—because Defendants provide none—that [defendant] even had an arbitration agreement in its Terms and Conditions in 2014, let alone that Plaintiff[] agreed to them at that time. [Defendant] cannot rely on screenflows from 2022 to prove consent in 2014"); *Perez v. Bath & Body Works, LLC*, No. 21-cv-05606-BLF, 2022 U.S. Dist. LEXIS 15091, at *2 (N.D. Cal. Jan. 27, 2022) ("[plaintiff] allegedly registered for the loyalty program in September 2017. But, the loyalty program terms and conditions attached to [defendant]'s motion did not take effect until October 15, 2019. [Defendant] can only carry its burden by providing the terms and conditions

to which [plaintiff] assented").[2] Likewise, Defendants also fail to both provide a full version of the sign-in page that they allege Plaintiffs used to register for their accounts, and to represent the date on which the sign-in page depicted in their Motion became active on the Website. *See* Mot. at 10:11-11:11.

As Defendants have failed to even meet their burden to prove the existence of an arbitration agreement, the Court cannot grant their request to compel arbitration.

### C. PLAINTIFFS DID NOT CONSENT TO DEFENDANTS' UNAUTHORIZED DISCLOSURE OF THEIR SENSITIVE INFORMATION.

#### i. Defendants have not satisfied their burden to prove that the purported Privacy Notice exists.

Defendants' entire argument in support of dismissal of many of Plaintiffs' claims is dependent on Plaintiffs' acceptance of the terms in their purported Privacy Notice. *See* Mot. at 18:24-19:22 (as to ECPA and CIPA), 20:3-8 (as to New York GBL); 22:5-16 (as to invasion of privacy), 23:4-16 (as to negligence). Yet, for the same reasons that Defendants fail to establish the existence of the arbitration clause that they seek to enforce, Defendants also fail to establish the existence of the Privacy Notice. The Privacy Notice that Defendants reference clearly states that it was "Last Modified: April

[2] In their Request for Judicial Notice, Defendants suggest in passing that the Court could take judicial notice of historical versions of the exhibits that Plaintiffs rely upon. ECF 40-3, at 2:17-19. This is a moot point, because Plaintiffs do not rely upon any such historical documents. But, even were it not, what Defendants suggest is a logical impossibility. The historical versions of such documents are no longer available on the Website, making it impossible for the Court to take judicial notice of documents that are neither part of the record nor publicly available.

2nd, 2025"—once again, ***after*** Plaintiffs created their Website accounts in 2024. *Compare* ECF No. 28-4, at p. 1, *with* SAC ¶¶ 18, 23; *see also* Mot. at 16:26-17:3 (acknowledging that Plaintiffs first used Website in 2024). Thus, the Court cannot rely on this Privacy Notice for the reasons stated in § IV(B)(i), *supra*, relating to Defendants' purported arbitration clause.

**ii. Even if Defendants can prove the purported Privacy Notice exists, it still fails to provide appropriate notice.**

Under California law, "internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463, 289 Cal. Rptr. 3d 1, 21 (2021)). "Sign-in wrap" agreements, sometimes referred to as a "modified clickwrap" agreements are those that:

> include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an 'I agree' button. Instead, the consumer is purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to 'sign in' or sign up' for an account.

*Sellers*, 289 Cal. Rptr. 3d 1, 21 (2021). Both parties agree that the Terms of Service agreement in-question is a sign-in wrap agreement. *See* Mot. 11:5-6. When it comes to sign-in wrap agreements:

> [T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.

*Sellers*, 73 Cal. App. 5th at 453. "Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). Accordingly, "[c]ourts commonly reject[] agreements…where a multi-step process is required for a website visitor to view the agreement at issue." *Ramirez v. Trusper, Inc.*, No. 5:24-cv-02012-EJD, 2024 U.S. Dist. LEXIS 186303, at *15-16 (N.D. Cal. Oct. 11, 2024).

The screenshot incorporated into Defendants' Motion clearly shows that Plaintiffs agreed only to Defendants' Terms and Conditions, ***not*** their Privacy Notice. *See* Mot. 10:15-22. To actually find the Privacy Notice, Plaintiffs would have had to click the link to the Terms of Conditions on the sign-in page, then scroll to the third page of the Terms and Conditions where they would only be informed of the *existence* of the Privacy Notice, then forced to follow another link to finally discovery the actual terms of the Privacy Notice. *See* ECF No. 28-3, at 3. Then, to track down Defendants' Cookie Notice and List of Processors, Plaintiffs would have had to further navigate to the third page of the Privacy Notice and follow two additional links included therein. *See* ECF No. 28-4, at 3. This attenuated process is wholly irreconcilable with the prominent notice

requirements imposed under California law for enforcement of a sign-in wrap agreement. Indeed, courts applying California law routinely refuse to enforce website terms under similar circumstances.[3]

**iii. Even assuming *arguendo* that Plaintiffs agreed to the Privacy Notice, the Court still cannot conclude that Plaintiffs consented to Defendants' practices because the Privacy Notice does not actually disclose them.**

In their purported Privacy Notice, Defendants explain the ways in which they use Website visitors' "personal information." ECF 28-4, at 2. The only one of these uses which suggests that Defendants may use Sensitive Information for advertising purposes is Defendants' representation that they may "analyze your use of, or interest in the content, products, or services, [or] to display content and advertising tailored to your interests ***on Pornhub***." *Id*. (emphasis added). Moreover, with regards to service

---

[3] *See Ramirez v. Trusper, Inc.*, No. 5:24-cv-02012-EJD, 2024 U.S. Dist. LEXIS 186303, at *15-16 (N.D. Cal. Oct. 11, 2024) (collecting cases to show that "[c]ourts commonly reject[] agreements…where a multi-step process is required for a website visitor to view the agreement at issue"); *Krayzman v. Istockphoto LP*, No. 24-cv-03086-VC, 2024 U.S. Dist. LEXIS 181294, at *1-2 (N.D. Cal. Oct. 3, 2024) (finding where the plaintiff "clicked a button that said 'I agree' with the statement…'you accept our Privacy Policy and Terms of Use,'" terms in a License Agreement linked to by both the Privacy Policy and Terms of Use were not enforceable); *Sellers*, 289 Cal. Rptr. 3d at 31 (finding that where plaintiff agreed to Terms of Service agreement, arbitration clause linked to by Terms of Service agreement was not enforceable); *McKee v. Audible, Inc.*, No. CV 17-1941-GW(Ex), 2017 U.S. Dist. LEXIS 174278, at *31-32 (C.D. Cal. July 17, 2017) ("Alexa's disclosure that 'tapping' the Begin Setup button binds the user to *Alexa's* Terms…is not the same thing as a disclosure that initiating setup binds the user to the terms contained *in all seven of the agreements* listed as part of Alexa's Terms"); *Meyers v. Alphabet, Inc.*, No. CV 21-1767 FMO (MAAx), 2022 U.S. Dist. LEXIS 98298, at *11 (C.D. Cal. Feb. 14, 2022) ("[statement that user agrees to Terms and Conditions] would not put a reasonable consumer on notice that by clicking Redeem, he or she would be agreeing to a forum selection clause found numerous hyperlinks away"); *Mason v. CreditAnswers, LLC*, No. 07cv1919-L(POR), 2008 U.S. Dist. LEXIS 68575, at *7 (S.D. Cal. Sep. 4, 2008) (forum selection clause not enforceable because "the Service Agreement does not emphasize or draw attention to the forum selection clause in any way").

providers, including Google Analytics, the Privacy Notice states that personal information is only disclosed to service providers to "enable us to provide our services" and that these service providers "are not permitted to process such information for any other purposes." *Id.*, at 3. Plaintiffs' allegations directly contradict these promises. Plaintiffs allege that Defendants knowingly transmitted their Sensitive Information to Google *via* the Tracking Tools not merely to enable PornHub's services and advertising on the Website, but also to enable hyper-precise advertising services for Google's entire advertiser network. SAC ¶¶ 74-79. Thus, even if Defendants could prove that Plaintiffs assented to the purported Privacy Notice (it cannot), this consent would still not preclude Plaintiffs' claims as the purported Privacy Notice promises that any third-party disclosures are limited to those necessary for Defendants' own operations and advertising, and therefore fails to put readers on notice of the disclosures alleged by Plaintiffs.[4]

### D. PLAINTIFFS' VPPA CLAIM IS WELL-PLED.

The VPPA "prohibits a 'video tape service provider' from knowingly disclosing 'personally identifiable information' about one of its consumers '*to any person*'..."

[4] Additionally, with regards to the VPPA, Defendants' Privacy Notice is additionally defective under VPPA's statutory requirements. Under the VPPA, personally identifiable information may only be disclosed with the informed, written consent of the consumer (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (2) that is granted for a period not to exceed 2 years; and (3) where the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election. 18 U.S.C. § 2710(2)(B). None of those requirements are met by the purported Privacy Notice.

*Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) (citations omitted) (emphasis in original). As the Ninth Circuit noted, "[c]onsistent with Congress's purpose, the [VPPA]'s language is broad." *Id*. In response to Plaintiffs' claim under the VPPA, Defendants argue that (1) Plaintiffs do not properly allege that Defendants disclosed their personally identifiable information ("PII"); and (2) that Plaintiffs are not "consumers" within the meaning of the VPPA. As explained below, both of Defendants' arguments fail.

**i. Plaintiffs allege that Defendants disclosed their personally identifiable information.**

Under the VPPA, "the term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services..." 18 U.S.C. § 2710(a)(3). In this Circuit, "[p]ersonally identifiable information includes information that 'standing alone, identifies a person' as well as information that is 'capable of' identifying a person." *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 772 (N.D. Cal. 2025) (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017)).

Here, Plaintiffs allege that Pornhub transmits a wealth of information about how users interact with the Website to TrafficJunky and third-party advertisers such as Google. SAC ¶ 6. Plaintiffs allege that Pornhub discloses the URL and specific data about the videos that they view (*id.* ¶¶ 74, 78), while simultaneously disclosing PII about its users, including the Google "cid" cookie, which identifies the users respective Google

accounts. *Id*. ¶ 75. In addition to information about each user's viewing habits in conjunction with their personal Google account, Pornhub discloses information that creates a browser fingerprint for each user, including the user's language preferences, screen resolution, browser software and version, operating system software and version, device type, network type, and internet service provider. *Id*. Pornhub discloses the same categories of PII to TrafficJunky, including information collected from Google's cookies in violation of Google's Terms of Service. *Id*. ¶ 78-79. The purpose of these disclosures is to create comprehensive advertising profiles so that users can be precision-targeted with ads based on their viewing habits. *Id*. ¶ 45. Thus, there is no question that the disclosed information is "capable" of identifying specific users and the videos they watch, as contemplated by 18 U.S.C. § 2710(a)(3).

Defendants' argument primarily relies on the Ninth Circuit's decision in *Eichenberger v. ESPN, Inc*., 876 F.3d 979 (9th Cir. 2017). But, far from supporting Defendants' position, *Eichenberger* instead shows why Defendants' argument must fail. In *Eichenberger*, the plaintiff downloaded an app produced by defendant ESPN, Inc. ("ESPN") onto his Roku digital streaming device, a device which "allows users to view videos and other content on their televisions by means of Internet streaming." *Id* at 981. Unbeknownst to the plaintiff, "every time [the p]laintiff watched a video, Defendant knowingly disclosed to a third party, Adobe Analytics: (1) [the plaintiff]'s Roku device serial number and (2) the identity of the video that he watched." *Id*. On appeal, the Ninth

Circuit upheld dismissal of the plaintiff's claims, finding that the information disclosed did "not constitute 'personally identifiable information' under the VPPA." *Id*. at 986.

Importantly, in *Eichenberger*, the Roku serial number disclosures were crucially *not* made to Roku, who would of course be able to link its own device serial numbers to its customers' identities. Rather, they were made to Adobe Analytics, who was only able to identify the individuals associated with the serial numbers by "connecting that information 'with existing data already in Adobe's profile of th[ose] individual[s],'…such as 'email addresses, account information, or Facebook profile information, including photos and usernames'—***from sources other than Defendant***." *Id*. (emphasis added). This point was critical to the Ninth Circuit's analysis. As the VPPA focuses on what a video service provider "knowingly discloses," the Ninth Circuit reasoned that a VPPA violation cannot lie where, as with ESPN's disclosures to Adobe Analytics, the video provider would not have "understood that if [it] disclosed" the relevant information to a third party, "the recipient of that information could identify the customer." *Id*. at 985. Moreover, the *Eichenberger* court also held that its decision did not conflict with the First Circuit's decision in *Yershov v. Gannett Satellite Info. Network, Inc.*, wherein the First Circuit found that GPS information was personally identifiable under the VPPA where the discloser knew that the third-party recipient had "the 'game program,' so to speak, allowing it to link the GPS address and device identifier information to a certain person by name, address, phone number, and more."

*Yershov*, 820 F.3d 482, 486 (1st Cir. 2016); *accord Eichenberger*, 876 F.3d at 986 ("it is not difficult to imagine other examples that may also count [as personally identifying information]—for example…as in *Yershov*, the GPS coordinates of a particular device").

Plaintiffs allege, and discovery will confirm, that the Google ID numbers disclosed to Google by Defendants allow Google to identify their Google accounts without reference to any additional information. *See* SAC ¶ 75. So, unlike in *Eichenberger*, the information disclosed to Google by Defendants allowed Google to identify Plaintiffs without reference to any other data that Defendants never disclosed nor possessed. *Compare id.*, *with Eichenberger*, 876 F.3d at 986. Moreover, Defendants "understood that if [they] disclosed" Plaintiffs' Google identifiers and pornographic viewing history to Google, that "the recipient of that information could identify [Plaintiffs]." *Id*. at 985. Indeed, Defendants used Google's advertising tools precisely because of Google's ability to target specific users with precise targeted ads based on their viewing habits. SAC ¶ 45. Accordingly, Defendants' use of the Tracking Tools violated the VPPA under the principles set forth in *Eichenberger*.

The vast majority of courts that have applied *Eichenberger* to the disclosure of advertising IDs through Tracking Tools have reached this same conclusion. For example, in *Archer v. NBCUniversal Media, LLC*, the court found that where video information linked to a Facebook ID number was disclosed to Facebook's parent

company, Meta, the plaintiffs' allegations were distinguishable from *Eichenberger* because Meta could identify the plaintiffs through their Facebook ID numbers without the need for any other data that the defendant never disclosed nor possessed." No. 2:24-CV-10744-AB-JC, 2025 U.S. Dist. LEXIS 129598, at *13-14 (C.D. Cal. July 2, 2025); *see also Sellers v. Bleacher Report, Inc.*, No. 23-cv-00368-SI, 2023 U.S. Dist. LEXIS 131579, at *14 (N.D. Cal. July 28, 2023) (disclosure of Facebook ID-linked information to Meta through Meta Tracking Tools is personally identifiable under the VPPA);[5] *Edwards v. Mubi, Inc.*, 773 F. Supp. 3d 868, 885 (N.D. Cal. 2025) (same as to X, Twitter, and Meta Tracking Tools); *Thornton v. Mindvalley, Inc.*, No. 24-cv-00593-EKL, 2025 U.S. Dist. LEXIS 53202, at *11-12 (N.D. Cal. Feb. 14, 2025) (same); *Plotsker v. Envato Pty Ltd.,* No. 2:24-cv-04412-MEMF-RAO, 2025 U.S. Dist. LEXIS 168070, at *20 (C.D. Cal. Aug. 26, 2025) (same); *Garcia v. Bandai Namco Ent. Am. Inc.,* No. 8:25-cv-00967-DOC-PVC, 2025 U.S. Dist. LEXIS 152616, at *23 (C.D. Cal. Aug. 7, 2025) (same); *Lee*, 773 F. Supp. 3d at 772-73 (same); *Ade v. Viki, Inc.*, No. 23-cv-02161-RFL, 2024 U.S. Dist. LEXIS 79467, at *2 (N.D. Cal. Mar. 28, 2024) (same); *Fan v. NBA Props. Inc.*, No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *2 (N.D. Cal. Mar. 26, 2024) (same).[6] Additionally, while the Google user account information is sufficient

---

[5] Google and Meta's Pixel Tracking Tools function in the same maner. *See, e.g., Doe v. Tenet Healthcare Corp.*, No. 1:23-cv-01106-DC-CKD, 2025 U.S. Dist. LEXIS 109134, at *10 (E.D. Cal. June 9, 2025); *I.T. v. ChoicePoint LLC*, No. C25-00193, 2025 U.S. Dist. LEXIS 169202, at *3 (W.D. Wash. Aug. 29, 2025).

[6] In fact, these ID numbers may do more to personally identify a user than the dissemination of that person's name. As one court observed, "[e]ven a name may be ambiguous because most names are not

to constitute PII under the VPPA, Defendants disclose even *more* information than that. As specified *supra*, Defendants disclose extensive data about the device and browser on which a user accesses the Website, which information is often unique and can track a user's activity across the internet. *See* SAC ¶ 68.

Additionally, *Eichenberger* was decided eight years ago and, as the Ninth Circuit observed, "modern technology may indeed alter—or may already have altered—what qualifies under the statute." *Eichenberger*, 876 F.3d at 986. For example, "[a] Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual." *Id*. Thus, to the extent that the Court finds any merit in Defendants' argument, it should be adjudicated by a fact-finder rather than on a Rule 12(b)(6) motion. *See Bandai Namco Ent. Am. Inc.*, 2025 U.S. Dist. LEXIS 152616, at *22-23 ("At a minimum, it is a question of fact whether an ordinary person could identify Plaintiff's Facebook ID and video game titles from the Pixel Code."); *see also Nguyen v. Elsevier Inc.*, No. 25-cv-00825-NC, 2025 U.S. Dist. LEXIS 109280, at *11 (N.D. Cal. June 9, 2025) ("Ultimately, the Court does not resolve disputes of fact in a motion to dismiss. As the Court 'must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party,' the question of '[w]hether a URL sufficiently identifies a video is ultimately a factual question that should not be

---

unique…" *Manza v. Pesi, Inc.*, 784 F. Supp. 3d 1110 (W.D. Wis. 2025). In contrast, one court in this Circuit observed that a Facebook ID (as referenced above) is "a unique identifier that is enough, on its own, to identify a person." *Sellers v. Bleacher Report, Inc.*, No. 23-cv-00368-SI, 2023 U.S. Dist. LEXIS 131579, at *13 (N.D. Cal. July 28, 2023). The same is true of Google's cid cookies.

resolved on motion to dismiss.'") (internal citations omitted)). Here, Plaintiffs plausibly allege that Pornhub's disclosure of information to Google and TrafficJunky identifies specific consumers and the videos which they requested or obtained from Pornhub. See 18 U.S.C. § 2710(a)(3).

**ii. Plaintiffs are consumers under the VPPA.**

The VPPA defines a consumer as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." § 2710(a)(1). Defendants argue, as a threshold matter, that Plaintiffs are not "consumers" as defined by the VPPA and, thus, cannot bring a claim for a violation of § 2710(b)(1).

To be considered a "consumer" under the VPPA, an individual does not have to make purchases, which "squares with the statutory text and the decisions of the two circuits to have considered the issue." *Jefferson v. Healthline Media, Inc.*, 674 F. Supp. 3d 760, 764 (N.D. Cal. 2023) (citing *Yershov*, 820 F.3d at 487-88). "Congress could have easily specified that 'consumer' meant 'any renter, purchaser, or paid subscriber,' but chose not to qualify 'subscriber' in that fashion." *Jefferson v. Healthline Media, Inc.*, 674 F. Supp. 3d 760, 764 (N.D. Cal. 2023). Thus, "the VPPA broadly protects paid and unpaid subscribers." *Id.*

Defendants cite only one case to support their argument that Plaintiffs are not "consumers," and concede that there is no controlling authority on the definition of a "subscriber" under VPPA. *See* Mot. 16:18-20 (citing *Kuzenski v. Uproxx LLC*, No. 2:23-

cv-00945-WLH-AGR, 2023 U.S. Dist. LEXIS 211822, (C.D. Cal. Nov. 27, 2023). Many courts within this Circuit have already explicitly rejected such an argument. For example, as is the case here, the plaintiff in *Jackson v. Fandom, Inc.* alleged "that she created a Fandom account; became a registered user; 'provided Fandom with her PII, including her name and email address'; and then used Fandom to watch videos." No. 22-cv-04423-JST, 2023 U.S. Dist. LEXIS 125531, at *9 (N.D. Cal. July 20, 2023). The court held that her allegations were "sufficient to plead that [plaintiff] is a subscriber, and therefore a consumer, within the meaning of the statute." *Id.* Similarly, in *Ade v. Viki, Inc.*, the court held that allegations that the plaintiffs provided their names and email addresses to register as members of the defendant's website, that the membership gave the plaintiffs access to online video content and pre-recorded rentals, and that the plaintiffs watched the videos on a recurring basis plausibly alleged the plaintiffs were subscribers. No. 23-cv-02161-RFL, 2024 U.S. Dist. LEXIS 79467, at *3 (N.D. Cal. Mar. 28, 2024). Many courts have reached the same conclusions. *See, e.g.*, *In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2012 U.S. Dist. LEXIS 112916, at *23 (N.D. Cal. Aug. 10, 2012) (finding plaintiffs' allegations that they "signed up for a Hulu account, became registered users, received a Hulu ID, established Hulu profiles, and used Hulu's video streaming services" sufficient to establish they were subscribers and, thus, consumers within the meaning of the VPPA); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 722 (N.D. Cal. 2023) (holding that allegations that plaintiffs registered for an

account and viewed video content on defendant's website satisfied the "consumer" definition of the VPPA); *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023) ("As explained in *Ghanaat*, this Court finds that where users exchanged personal information in return for a service, they are consumers."); *Lee v. Springer Nature Am., Inc.,* 769 F. Supp. 3d 234, 254 (S.D.N.Y. 2025) ("A person becomes a VPPA subscriber by providing consideration in the form of personal information in exchange for a good or service.").

Defendants attempt to persuade the Court that the subscription must have a "factual nexus or relationship" with "the defendant's allegedly actionable video content." Mot. 17:12-13 (citing *Kuzenski,* 2023 U.S. Dist. LEXIS 211822, at *10). Even if that were the case (it is not), Defendants cite no authority to support the argument that there is no "factual nexus or relationship" to the use of videos that are available to both registered and unregistered users. *See* Mot. 17:12-16. Indeed, nothing in *Jackson* indicates that the videos at issue were restricted to subscribers, yet the court found that the plaintiff was a subscriber. *Jackson*, 2023 U.S. Dist. LEXIS 125531, at *1, 9. Even the sole opinion cited by Defendants acknowledges that exclusive access to video content is just one factor to be considered in the subscriber analysis. *Kuzenski*, 2023 U.S. Dist. LEXIS 211822, at *13, n. 6. ("Further, the Court is not creating a bright-line, categorical rule requiring that a subscription must provide access to exclusive video content not otherwise available to viewers without a subscription"). Further still, even if

they were able to cite any relevant authority, Defendants tacitly admit that there *is* content on Pornhub that is not available to unregistered users. *See* Mot. 17:17-18 ("And *much* of the content on Pornhub is available to unregistered users.") (emphasis added). Plaintiff M.S. indeed alleges that he was a paid subscriber during the relevant time period and viewed context exclusively available to paid members of Pornhub. Thus, this Court should not endeavor to resolve, prior to the commencement of discovery, a factual dispute over what videos registered and unregistered users can access on Pornhub.

For these reasons, Plaintiffs' VPPA claim is well-pled and Defendants' Motion should be denied.

### E. PLAINTIFFS DID NOT CONSENT TO DEFENDANTS' VIOLATIONS OF THE ECPA AND CIPA.

Defendants' sole argument with regards to Plaintiffs' ECPA and CIPA claims is that Plaintiffs' purported consent to Defendants' Privacy Notice is an absolute bar to Plaintiffs' claims under the ECPA and CIPA. These arguments fail for these reasons stated in § IV(C), *supra*.

### F. PLAINTIFFS' INVASION OF PRIVACY CLAIM IS WELL-PLED.

To state a claim for intrusion upon seclusion, "[p]laintiffs must show that: (1) a defendant 'intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy,' and (2) that the intrusion was 'highly offensive' to a reasonable person." *Silver v. Stripe Inc.*, 2021 U.S. Dist. LEXIS 141090, *16 (N.D. Cal. July 28, 2021) (quoting *Hernandez v. Hillsides*, Inc., 47 Cal 4th 272, 287,

97 Cal. Rptr. 3d 274, 211 P.3d 1063(2009)). Defendants argue that Plaintiffs cannot establish a reasonable expectation of privacy under these circumstances due to their purported consent to Defendants' Privacy Notice. This argument fails for these reasons stated in § IV(C), *supra*. Indeed, Plaintiffs have alleged an invasion of privacy under California law. The vast majority of courts applying California law have found that a defendant's use of Tracking Tools to disclose personal information can create a claim for invasion of privacy.[7] Plaintiffs' analogous allegations with regard to their Sensitive Information—which this Court has already found to be sufficiently sensitive to warrant the use of pseudonymization—properly pleads a claim for invasion of privacy under California law. *See* ECF No. 2, 27.

**G. PLAINTIFFS' NEGLIGENCE CLAIM IS WELL-PLED**

Once again, Defendants argue that Plaintiffs' purported consent to Defendants' Privacy Notice defeats Plaintiffs' negligence claims. This argument again fails for the reasons stated in § IV(C), *supra*.

Additionally, Defendant argues that Plaintiffs' negligence claim fails through operation of the economic loss doctrine. This argument is unavailing. The economic loss doctrine only encompasses purely economic injuries. *Stasi v. Inmediata Health Grp.*

[7] *See, e.g.*, *Silver*, 2021 U.S. Dist. LEXIS 141090, at *15 ("plaintiffs' allegations that [defendant] compiled and disseminated plaintiffs' sensitive data precludes the Court from finding that plaintiffs have no reasonable expectation of privacy"); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 801 (same); *Doe v. Regents of the Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023) (same); *St. Aubin v. Carbon Health Techs., Inc.*, No. 24-cv-00667-JST, 2024 U.S. Dist. LEXIS 179067, at *37 (N.D. Cal. Oct. 1, 2024) (same); *Doe v. Fullstory, Inc.*, 712 F. Supp. 3d 1244 (N.D. Cal. 2024) (same).

*Corp.*, 501 F. Supp. 3d 898, 913 (S.D. Cal. 2020). It does not preclude claims based on privacy injuries like those alleged by Plaintiffs. *See id.*; *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1142 (C.D. Cal. 2021) (economic loss doctrine not applicable because "Plaintiffs have not alleged merely economic injury. Rather, they have alleged a privacy injury stemming from the unauthorized sharing of their private medical information").

### H. UNJUST ENRICHMENT

To state a claim for unjust enrichment, Plaintiffs must allege that Defendants received and unjustly retained a benefit at their expense. *See ESG Capital Partners, Ltd. P'ship v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). District courts in the Ninth Circuit routinely allow unjust enrichment claims to proceed in pixel and data misuse cases like this one.[8] Moreover, the Ninth Circuit has held that a plaintiff is entitled to disgorgement of unjustly earned profits regardless of whether a defendant's actions "caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the Plaintiffs' property to become less valuable." *In re Facebook Inc.*, 956 F.3d at 600.[9]

---

[8] *See, e.g., Fullstory*, 712 F. Supp. 3d (denying dismissal of unjust enrichment claim in a Meta Pixel action alleging misuse of personally identifiable information); *C.M. v. MarinHealth Med. Grp., Inc.*, No. 23-cv-04179-WHO, 2024 U.S. Dist. LEXIS 10189, at *15 (N.D. Cal. Jan. 19, 2024) (similar); *Katz-Lacabe v. Oracle Am., Inc.*, No. 22-cv-04792-RS, 2023 U.S. Dist. LEXIS 178369, at *6 (N.D. Cal. Oct. 3, 2023) (holding that plaintiffs sufficiently pleaded facts to establish unjust enrichment where plaintiffs would not have visited defendant's websites with surreptitiously installed tracking technologies that conferred a benefit to defendant at the expense of plaintiffs' privacy).

[9] *See also Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 815 (N.D. Cal. 2011) (recognizing plaintiff whose information was misappropriated by Facebook "may properly seek restitution"); *In re Anthem Inc. Data Breach*

Defendants' consent argument again fails for the reasons stated in § IV(B), *supra*.

## V. CONCLUSION

For the aforementioned reasons, this Honorable Court should **DENY** the Defendant's Motion to Dismiss.

Dated: October 10, 2025

Respectfully submitted,

*/s/ Sonjay Singh*
Sonjay Singh (*Pro Hac Vice*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (772) 783-8436
Email: ssingh@sirillp.com

Michael Connett (SBN #300314)
**SIRI & GLIMSTAD LLP**
700 S. Flower St., Ste. 1000
Los Angeles, CA 90017
Tel: 212-532-1091
Email : mconnett@sirillp.com

*Attorneys for Plaintiffs and the Putative Class*

*Litig.*, 2016 U.S. Dist. LEXIS 70594, at *14 (N.D. Cal. May 27, 2016) (finding that plaintiffs' personal information was stolen in a data breach and thus lost value, which constituted an injury to plaintiffs); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 U.S. Dist. LEXIS 140212, *13-14 (N.D. Cal. Aug. 30, 2017) (same).