Nada I. Shamonki (SBN 205359)
NIShamonki@mintz.com
Nadia A. Zivkov (SBN 342509)
NAZivkov@mintz.com
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.**
2049 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

*Attorneys for Defendant Aylo Freesites Ltd*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

M.S. AND C.P., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

vs.

AYLO GLOBAL ENTERTAINMENT, INC. AYLO USA INCORPORATED, AND TOQON, LLC D/B/A TRAFFICJUNKY,

Defendants.

Case No. 2:25-cv-01139-DJC-JDP

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION OR TO DISMISS THE THIRD AMENDED COMPLAINT**

Assigned to the Hon. Daniel J. Calabretta

Hearing
Date: May 21, 2026
Time: 1:30 p.m.
Location: 501 I Street
Courtroom 7, 14th Floor
Sacramento, CA 95814
Third Amended Complaint Filed: February 24, 2026
Trial Date: Not set

# TABLE OF CONTENTS

Page


PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 2

I. Plaintiffs agreed to arbitrate their claims because Pornhub's sign-up page provided reasonably conspicuous notice of the Terms and Conditions, which contained an arbitration clause at all relevant times. .......... 2

II. Plaintiffs' Opposition fails to cure the numerous pleading defects, and indeed (once again) concedes dismissal on several claims. .......... 8

A. Plaintiffs' VPPA claim (Count V) fails. .......... 8

1. Google is not an "ordinary person," and so Pornhub did not disclose any PII .......... 8

2. Defendant did not argue that Plaintiffs failed to satisfy the VPPA's scienter requirement .......... 10

3. Plaintiffs are not "consumers" under the VPPA .......... 10

B. Plaintiffs' consent defeats their ECPA (Count VI), CIPA (Count VIII), invasion of privacy (Count I), negligence (Count II), and unjust enrichment claims (Count IV). .......... 12

1. The Privacy Policy was incorporated by reference into the Terms of Service to which Plaintiffs agreed .......... 12

2. All versions of the Privacy Policy disclose the complained-of data collection and disclosure practices .......... 13

C. Plaintiffs' unjust enrichment claim (Count IV) fails because a plaintiff cannot sue in tort and claim unjust enrichment as a matter of law. .......... 15

D. Plaintiffs once again concede their remaining claims fail. .......... 15

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ade v. Viki, Inc.*,
2024 WL 1880153 (N.D. Cal. Mar. 28, 2024) ... 11

*Blantz v. Cal. Dep't of Corr. & Rehab.*,
727 F.3d 917 (9th Cir. 2013) ... 10

*Carroll v. Chick-Fil-A, Inc.*,
2024 WL 1091193 (N.D. Cal. Feb. 13, 2024) ... 11

*Chabolla v. Classpass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ... 7

*Doe v. Shady Grove Reprod. Sci. Ctr., P.C.*,
2025 WL 2781542 (D. Md. Sep. 30, 2025) ... 9

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979, 985 (9th Cir. 2017) ... 9

*Freitas v. Cricket Wireless, LLC*,
2022 WL 1082014 (N.D. Cal. Apr. 11, 2022) ... 13

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) ... 8

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
802 F. Supp. 2d 1070 (N.D. Cal. 2011) ... 15

*In re Holl*,
925 F.3d 1076 (9th Cir. 2019) ... 12, 13

*In re Hulu Privacy Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ... 11

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ... 8

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) ... 11

*Jefferson v. Healthline Media, Inc.*,
674 F. Supp. 3d 760 (N.D. Cal. 2023) ... 11

*Jones v. Skullcandy, Inc.*,
2026 WL 699819 (S.D. Cal. Mar. 12, 2026)........................................................................ 7

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ................................................................... 3, 4, 5, 6, 7

*Kuzenski v. Uproxx LLC*,
2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) ..................................................................... 10

*Lawrence v. Finicity Corp.*,
2025 WL 547375 (9th Cir. Feb. 19, 2025)........................................................................... 3

*Lee v. Springer Nature Am., Inc.*,
769 F. Supp. 3d 234 (S.D.N.Y. 2025)................................................................................. 11

*Lockhart v. United States*,
577 U.S. 347 (2016) ............................................................................................................ 14

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023)............................................................................10, 11

*Massel v. Successfulmatch.Com*,
2025 WL 2452371 (9th Cir. Aug. 26, 2025)......................................................................... 2

*Morrison v. Yippee Ent., Inc.*,
2025 WL 2389424 (9th Cir. Aug. 18, 2025)......................................................................... 4

*Morrison v. Yippee Ent., Inc.*,
756 F. Supp. 3d 842 (S.D. Cal. 2024) ................................................................................. 4

*Navarro v. SmileDirectClub, Inc.*,
2022 WL 1786582 (N.D. Cal. June 1, 2022)......................................................................... 6

*Niedziela v. Viator, Inc.*,
2025 WL 2732916 (C.D. Cal. Sep. 25, 2025)........................................................................ 7

*Nixon v. Vegas.com, LLC*,
2025 WL 3719885 (N.D. Cal Dec. 23, 2025) ........................................................................ 7

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505, 515 (9th Cir. 2023) .....................................................................................4, 6, 7

*Pileggi v. Wash. Newspaper Publ'g Co., LLC*,
146 F.4th 1219 (D.C. Cir. 2025) ........................................................................................ 11

*Saeedy v. Microsoft Corp.*,
757 F. Supp. 3d 1172 (W.D. Wash. 2024)............................................................................ 6

*Silva v. WhaleCo, Inc.*,
2024 WL 4487421 (N.D. Cal. Oct. 10, 2024) .......... 4, 6

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .......... 15

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) .......... 7

*Vivendi SA v. T-Mobile USA Inc.*,
586 F.3d 689 (9th Cir. 2009) .......... 10

*Way v. JP Morgan Chase Bank, N.A.*,
2018 WL 1518677 (E.D. Cal. Mar. 28, 2018) .......... 15

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212 (9th Cir. 2019) .......... 6, 7

**PRELIMINARY STATEMENT**

Plaintiffs have now amended their Complaint *three* times but still have not cured (because they cannot cure) the fatal defects in their case.

This case belongs in arbitration. Plaintiffs' attempts to escape their binding agreement to arbitrate are built on distortion. To artificially clutter the sign-up window, their screen capture zooms out 40%, shrinking the sign-up form and dragging additional adult content into the frame that a user ordinarily would not see. At a standard setting, the sign-up form occupies the user's screen and the notice language is prominently in the user's direct line of sight. Courts have routinely upheld notice on pages with comparable or more prominent imagery. Thus, Plaintiffs pivot to attacking Defendant's evidence. They argue that the hyperlink to the Terms of Service was not conspicuous because of its size and blaze orange color, even though there is no bright-line rule dictating these design elements. They claim that Defendant's exhibits are misleading because they display white backgrounds and do not show a faded background image visible on the live page. But Defendant provided the Court (and Plaintiffs) with the relevant URLs, and those differences are artifacts of how browsers render webpages when printing to PDF -- a format Defendant used specifically because Plaintiffs previously objected that Defendant did not provide a "full version" of the sign-in page. And they challenge the authenticity of the webpages, even though courts routinely accept captures from the Wayback Machine internet archive that Defendant used here. These are all moving targets designed to avoid the reality that Plaintiffs agreed to arbitrate their dispute.

Even if the Court reaches the merits, Plaintiffs fare no better. Their claim under the VPPA fails because they still cannot explain how anyone other than Google can decode their data to identify them specifically. Plaintiffs offer two new cases, but one applies an out-of-circuit standard that does not govern here, and the other involved different technology (Facebook IDs) that map to publicly accessible user profiles, not the anonymous cookies alleged in the Complaint. Plaintiffs' new argument about the

VPPA's scienter requirement is based only on a conclusory allegation and conflates the routine use of a standard analytics tool with the knowing disclosure of personally identifiable information. And Plaintiffs' consent to Pornhub's Privacy Policy indisputably dooms the bulk of their claims because, since at least 2024, Pornhub has disclosed that it might engage in the precise activities of which Plaintiffs now complain. Plaintiffs themselves concede as much, acknowledging that the various versions of the Privacy Policy, Terms and Conditions, Sign-Up Page, and Arbitration Agreement are "largely identical in relevant part."

Plaintiffs should be compelled to arbitrate their claims, or their Third Amended Complaint should be dismissed with prejudice and without leave to amend.

## ARGUMENT

### I. Plaintiffs agreed to arbitrate their claims because Pornhub's sign-up page provided reasonably conspicuous notice of the Terms and Conditions, which contained an arbitration clause at all relevant times.

Plaintiffs do not dispute that Pornhub's Terms and Conditions contain an arbitration agreement, nor do they dispute that the arbitration agreement has been present in every version of the Terms in effect since at least 2024. (Opp'n at 2, nn. 2-3.) The only question remaining is whether Pornhub's sign-up page provided reasonably conspicuous notice of the Terms and Conditions when Plaintiffs allegedly signed up for Pornhub accounts. As Defendant explained, it does.

There is "no bright-line test for finding that a particular design element is adequate in every circumstance[,]" nor "per se rules about what's necessarily inadequate, either." *Massel v. Successfulmatch.Com*, 2025 WL 2452371, at *1 (9th Cir. Aug. 26, 2025) (citations omitted). "Such a one-size-fits-all approach . . . undermine[s] the fact-intensive, totality-of-the-circumstances nature of the analysis." *Id.* Instead, courts assess conspicuousness holistically, looking to the "visual aspects of the notice," including "the size of the textual notice," "its color as compared to the background it appears against," "its proximity to any box or button the user must click to continue use of the website," "the obviousness of any associated hyperlink," and "whether other

elements on the screen clutter or otherwise obscure the textual notice." *Lawrence v. Finicity Corp.*, 2025 WL 547375, at *1 (9th Cir. Feb. 19, 2025) (citations omitted), *rev'g Lawrence v. Finicity Corp.*, 716 F. Supp. 3d 851, 884 (E.D. Cal. 2024).

Plaintiffs' individual critiques each fail. They argue that the notice was not conspicuous because of (i) other imagery on the webpage, (Opp'n at 8-9), (ii) the size of the text in comparison to other text on the webpage, (*id.* at 9), and (iii) the color of the font and background on the webpage, (*id.* at 9). Each of those arguments, though, is foreclosed by binding precedent from the Ninth Circuit that has found similar design elements insufficient to vitiate a user's consent.

For example, in *Keebaugh v. Warner Bros. Entertainment Inc.*, the Ninth Circuit upheld notice on the sign-in pages for the mobile game *Games of Thrones: Conquest*. 100 F.4th 1005, 1020–21 (9th Cir. 2024). The pages featured vivid, full-screen images of dragons as the background. *See id*. at 1009–11. The sign-in page, in small white text on a black background, surrounded by much larger text, informed users that by tapping




2019 Version




2020 Version

"Play", they agreed to the game's Terms. *Id*. at 1011. The Court found this notice conspicuous. *Id*. at 1020–21.

Similarly, in *Oberstein v. Live Nation Entertainment, Inc.*, the Ninth Circuit found the notices on the Ticketmaster and Live Nation webpages conspicuous even where the webpage contained imagery next to the notice, contained a faded-out background behind the sign-up window, and placed the notice in smaller text than other parts of the webpage. 60 F.4th 505, 515 (9th Cir. 2023).




*Id*. at 515–16.[1]

And again in *Morrison v. Yippee Entertainment, Inc.*, the Ninth Circuit found the notice conspicuous even though the webpage contained large surrounding text and emoticons. 2025 WL 2389424, at *1 (9th Cir. Aug. 18, 2025); *see Morrison v. Yippee Ent., Inc.*, 756 F. Supp. 3d 842, 848 (S.D. Cal. 2024). This design, the Ninth Circuit said, was "not so visually cluttered that is distracted from the hyperlink." *Morrison*, 2025 WL 2389424, at *1.

District courts in this Circuit have applied this precedent to webpages just like the one at issue here. For example, in *Silva v. WhaleCo, Inc.*, the court found Temu's sign-up notice conspicuous even though the window was placed over a faded-out background of product imagery. 2024 WL 4487421, at *4 (N.D. Cal. Oct. 10, 2024). The

[1] *See also* Answering Brief for Defendants-Appellees at 16, *Oberstein*, Dkt. No. 30.

court found that "notice clearly passes the test," noting that it "reduces distractions by greying out the product purchase page in the background." *Id*. at *1, 4:




Pornhub's sign-up page matches -- and in many respects exceeds -- the design in each of these webpages and thus offers conspicuous notice.




(Lisy Reply Decl., Ex. X; *see id.*, Exs. Y-EE.) The notice here appears next to the action button.[2] *See, e.g.*, *Keebaugh*, 100 F.4th at 1020 ("conspicuously displayed directly . . .

---

[2] Plaintiffs do not dispute that the text of the notice adequately informs them that their action would constitute consent to the Terms of Service. (*See* Mot. at 9.)

below the action button"). The Terms and Conditions hyperlink is displayed in bright orange font, distinguishing it from the surrounding white text and black background. *See, e.g.*, *id.* (noting contrasting white font on black background). Although the webpage contains other text, the notice text is still large enough to draw a user's attention, especially given its placement and the stark contrast between the font color and black background. *See, e.g.*, *id.* (similarly small text in context); *Oberstein* 60 F.4th at 515–16 (similarly small text relative to other text on page, and the text was a less-contrasting grey on a white background). And although the webpage contains other imagery, it does not appear directly behind the notice and is otherwise faded out from the surrounding webpage design. *See, e.g.*, *Oberstein* 60 F.4th at 515–16 (webpage not cluttered even with faded background and imagery next to action button); *Silva*, 2024 WL 4487421, at *4 (concluding that "greying out" imagery around sign-up window decreased any visual clutter).

Plaintiffs' contrary arguments are based on evidence that distorts what the ordinary viewer sees upon navigating to the sign-up page. Their Opposition relies on a screenshot of the sign-up page captured at approximately 60% zoom, far below the standard 100% setting at which users browse the web. Plaintiffs' artificial presentation creates two problems: the text appears smaller than an ordinary user would view it, and there is more background content in the frame than any user would see in their web browser under normal browsing conditions. At the standard 100% setting, the sign-up form commands the page, and the notice appears next to the sign-up button in the user's line of site. A plaintiff cannot manufacture "distractions" based on visual elements that fall outside the user's ordinary field of vision.[3]

Plaintiffs' cited cases do not aid them either. (*See* Opp'n at 7–8.) *Wilson v.*

---

[3] Further, contrary to Plaintiffs' contentions, (*see* Opp'n at 6), courts regularly consider Wayback Machine copies of websites when assessing motions to compel arbitration, without requiring further authentication. *See, e.g.*, *Navarro v. SmileDirectClub, Inc.*, 2022 WL 1786582, at *2 (N.D. Cal. June 1, 2022) (considering Wayback Machine version of arbitration agreement); *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1193–94 (W.D. Wash. 2024) (same). Plaintiffs offer no basis to doubt the authenticity of the Wayback Machine records.

*Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019), and *Jones v. Skullcandy, Inc.*, 2026 WL 699819, at *16 (S.D. Cal. Mar. 12, 2026), both addressed "browsewrap" agreements, not a clickwrap agreement as here. In *Chabolla v. Classpass Inc.*, a split decision in which the dissent would have found notice reasonably conspicuous, the Court found the notice inconspicuous because of its "distance from relevant action items, its placement outside of the user's natural flow, and its font -- notably timid in both size and color." 129 F.4th 1147, 1156–58 (9th Cir. 2025).[4] Here, Plaintiffs do not contend that the notice was distant from the relevant action items. And the white font of the notice and the orange hyperlink contrasts with the black background, unlike the light-grey font on a white background present in *Chabolla*. Similarly, in *Niedziela v. Viator, Inc.*, the notice was "so small that it is barely legible to the naked eye" and in a "pale gray text, which causes it to blend in with -- rather than stand out against -- the white background." 2025 WL 2732916, at *8 (C.D. Cal. Sep. 25, 2025). The Court in *Nixon v. Vegas.com, LLC,* relied on the lack of contrast between the text and the background, remarking that "[w]hen [it] first looked at the notice, it missed the different color entirely, especially because the gray background makes it difficult to notice the contrast." 2025 WL 3719885, at *6 (N.D. Cal Dec. 23, 2025). And although the Court relied on a "12.5%" difference in font size, that logic cannot survive *Keebaugh* or *Oberstein*, both binding precedent in which the Ninth Circuit found text similar in size to that here to constitute conspicuous notice.[5] Here, no one can reasonably suggest that the contrasting font color is "timid" or difficult to observe.

Plaintiffs agreed to arbitrate. The Court should compel them to do so.

---

[4] Indeed, the light-grey font on a white background appears to be the dispositive factor, as the Court found even "Screen #2" -- which it acknowledged placed the notice in the user's natural flow -- to not provide conspicuous-enough notice. *See id.* at 1158, 1174.

[5] *Starke v. SquareTrade, Inc.*, not only applied New York (not California) law, it also addressed an alleged agreement, sent after the plaintiff had already completed his transaction, and buried at the bottom of an email that did not "advise [the plaintiff] that he would be deemed to agree to the contract terms in the document to be found by clicking that link." 913 F.3d 279, 293–95 (2d Cir. 2019).

## II. Plaintiffs' Opposition fails to cure the numerous pleading defects, and indeed (once again) concedes dismissal on several claims.

### A. Plaintiffs' VPPA claim (Count V) fails.

#### 1. Google is not an "ordinary person," and so Pornhub did not disclose any PII.

Plaintiffs claim that the Google 'cid' cookie and "user's language preference, screen resolution, browser software and version, operating system software and version, device type [], network type [], and internet service provider" can be used to identify specific users. (Opp'n at 16.) But they do not allege facts explaining how that is true under the ordinary-person standard applicable in this Circuit (which standard Plaintiffs tellingly never mention). The Third Circuit, applying the same ordinary-person standard, concluded that information does not constitute PII. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 290 (3d Cir. 2016) (combination of a user's browser and operating system settings not PII even though plaintiffs alleged 1 in 286,777 odds of two people having the same combination of settings). Plaintiffs have no response.

Instead, Plaintiffs rely on cases addressing Facebook IDs, a different technology that operates in (legally significant) different ways. (Opp'n at 16, 18.) Facebook IDs constitute PII because they "can be used, by anyone, to easily identify a Facebook user . . . by simply appending the [FID] to www.facebook.com." *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 857 (C.D. Cal. 2024). That is why Facebook IDs can be found to meet the ordinary-person standard: anyone with a computer can identify a specific individual using them. By contrast, Plaintiffs do not -- and indeed cannot -- allege that anyone *other than* Google can connect the Google ID numbers to individuals. (*See* Opp'n at 16–17 ("Plaintiffs allege that Pornhub disclosed their Sensitive Information to Google . . . alongside Google's own identifier that *it* uses to identify users across the Internet" (emphasis added)).) But Google -- the "online behemoth[]" that Plaintiffs allege is "the largest digital advertiser in the country" and engages in "monumental" and "ubiquitous" "surveillance of individual's internet usage," (TAC ¶¶ 7, 42, 48, 50) -- is far from an ordinary person. Plaintiffs' only support for their claim that

the Google 'cid' cookie constitutes personally identifiable information -- *Doe v. Shady Grove Reprod. Sci. Ctr., P.C.*, 2025 WL 2781542, at *4–5 (D. Md. Sep. 30, 2025) -- is no support at all. *Shady Grove* addressed a common-law intrusion-upon-seclusion claim, and thus did not analyze the meaning of "personally identifiable information" as that term is defined under the VPPA. *See id.* at *1. And there, the plaintiffs also alleged specifically that *Google* uses the 'cid' cookie to distinguish specific users -- not that anyone besides Google could do so, as the VPPA requires. *See id.*

Plaintiffs' fallback positions fare no better. They contend that Defendant reads *Eichenberger v. ESPN, Inc.* too narrowly, but it is Plaintiffs, not Defendant, who misconstrue the decision. 876 F.3d 979, 985 (9th Cir. 2017). *Eichenberger* expressly adopted the "ordinary person" standard, holding that disclosed information cannot constitute PII if the recipient would not be able to identify a specific individual without the use of additional, non-public data points. 876 F.3d at 985. Plaintiffs do not allege that even Defendant can translate the 'cid' cookies into specific Google accounts. Google has that information only "from sources other than Defendant." *See id.* at 981. Plaintiffs now recast this point as proof that Google's identifiers are "more effective" than names and addresses, but that misses what *Eichenberger* actually held: the ordinary-person standard asks whether the disclosed information itself would enable an *ordinary person* to identify a specific individual, not whether the recipient could do so by cross-referencing its own proprietary databases. *See id.* at 985. (*Cf.* Opp'n at 17.)

Plaintiffs then attempt to shoehorn themselves into what they see as an exception to *Eichenberger*, arguing that Defendant "understands that when it sends Google's identifiers to Google, Google can use that information to identify a person." (Opp'n at 17.) But even if that were an exception to *Eichenberger* (and Plaintiffs offer no Ninth Circuit precedent recognizing it as such), Plaintiffs offer no factual support for their sudden, made-for-litigation, and conclusory "information and belief" allegation -- which was not contained in three prior iterations of their complaint. In response, Plaintiffs offer nothing but generalized allegations that Defendant knowingly utilized Google Analytics,

which do not factually support their information-and-belief allegation that Defendant also knew a specific, alphanumeric cookie ID used by Google Analytics would allow Google to identify a particular user's Google account. *See, e.g.*, *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013) (conclusory allegations made on information and belief "insufficient to state a claim" where they are not supported by "specific factual allegations"); *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 694 (9th Cir. 2009) ("upon information and belief" allegations insufficient without further facts).

**2. Defendant did not argue that Plaintiffs failed to satisfy the VPPA's scienter requirement.**

Plaintiffs' scienter argument, raised for the first time, attacks a strawman. Defendant did not argue that Plaintiffs failed to plead the scienter requirement. (*See* Mot. at 12–18 (arguing that Plaintiffs failed to plead that Defendant disclosed personally identifiable information and that they are consumers).) Defendant's argument focused instead on Plaintiffs' attempt to expand the definition of "personally identifiable information" under the VPPA to information that, although it does not meet the ordinary-person standard, allegedly constitutes PII because the Defendant supposedly knew the third party could identify an individual using the information disclosed. That is a distinct analysis under the VPPA. (*See* Mot. at 15.)

**3. Plaintiffs are not "consumers" under the VPPA.**

Plaintiffs contend they are "consumers" under the VPPA merely because they created accounts and watched videos on Pornhub. But to be a "consumer," plaintiffs must plead more than visiting a website and watching videos. *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023). Plaintiffs' arguments fail for two independent reasons.

First, merely registering for an account -- which is all Plaintiffs allege here -- does not make Plaintiffs "consumers" under the VPPA. *Kuzenski v. Uproxx LLC*, 2023 WL 8251590, at *4 (C.D. Cal. Nov. 27, 2023) (plaintiff not a "consumer" even where he registered for an account). In each case on which Plaintiffs rely, the plaintiffs alleged

they provided the defendant with their "PII, including [their] name and email address." *See Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023); *Ade v. Viki, Inc.*, 2024 WL 1880153, at *1 (N.D. Cal. Mar. 28, 2024) (same); *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *8 (N.D. Cal. Aug. 10, 2012) (profile included "included name[ and] location preference information"); *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 254 (S.D.N.Y. 2025) (plaintiffs "submit their name, a valid email address, and payment information"); *see also Markels*, 689 F. Supp. 3d at 728 (plaintiffs gave "personal information").[6] Yet Plaintiffs here do not allege they provided Pornhub with their name or an email address linked to them. They do not allege what they provided to Pornhub at all, save for "browser fingerprint" data (which, as explained, is not PII).

Second, Plaintiffs claim without explanation that there need not be any link between the subscription and the videos at issue, but there are a litany of cases reaching the opposite conclusion. *See Carroll v. Chick-Fil-A, Inc.*, 2024 WL 1091193, at *1 (N.D. Cal. Feb. 13, 2024) (collecting cases); *Pileggi v. Wash. Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1237 (D.C. Cir. 2025) ("Subscribing to an e-newsletter that includes videos and video links, by itself, is not enough to make someone a 'consumer' under the Video Privacy Act. Instead, the videos for which viewing history is disclosed must be the same video materials or services that the individual purchased, rented, or subscribed to."). And indeed, in *Markels*, relied on by Plaintiffs (Opp'n at 21), the court concluded that the plaintiffs *failed* to plead they were consumers because "the videos are readily available to anyone who visits the site." 689 F. Supp. 3d at 728 ("[T]here must be some nexus between the plaintiff and defendant and the video content provided."). That makes sense. Were it otherwise, a consumer who purchased a sandwich at Chick-fil-A could hold Chick-fil-A liable for VPPA violations for videos on its website. *See Carroll*, 2024 WL 1091193, at *1–2. But here, Plaintiffs do not allege that they accessed videos

[6] *Jefferson v. Healthline Media, Inc.*, cited by Plaintiffs (Opp'n at 20), explains that even providing one's name and address is not sufficient under the VPPA; the provision of the name and address must be in exchange for a good or service. 674 F. Supp. 3d 760, 764 (N.D. Cal. 2023) ("Consequently, a VPPA subscriber is not just someone who provides her name and address to a website, for some undisclosed purpose or benefit.").

only available to registered users. Even M.S., who vaguely alleges he accessed "paid" videos, does not allege he could access those videos *because* he had an account (and indeed he has conceded that he has not paid anything to Pornhub (*see* Mot. at 17 n.14)).

### B. Plaintiffs' consent defeats their ECPA (Count VI), CIPA (Count VIII), invasion of privacy (Count I), negligence (Count II), and unjust enrichment claims (Count IV).

#### 1. The Privacy Policy was incorporated by reference into the Terms of Service to which Plaintiffs agreed.

Plaintiffs contend that they did not agree to the Privacy Policy because it was merely incorporated into the Terms of Service. Their argument flouts California law. "A contract may incorporate documents and terms by reference." *In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019). "Where it is clear that a party is assenting to a contract that incorporates other documents by reference, the incorporation is valid -- and the terms of the incorporated document are binding -- so long as the incorporation is clear and unequivocal, the reference is called to the attention of the other party and he consents thereto, and the terms of the incorporated document are known or easily available to the contracting parties." *Id.* (cleaned up).

For example, in *Holl*, the Ninth Circuit affirmed the district court's conclusion that a separate set of tariff-related terms were incorporated into UPS's Service Terms. *See id.* at 1079. There, the Service Terms stated in the first section that: (1) the tariff terms were "expressly incorporated," (2) that the most recent version of the tariff terms were available on UPS's website, and (3) that the user "expressly acknowledge[s] having 'reviewed, understood and agree[d] to the UPS Tariff/Terms and Conditions of Service.'" *Id.* The Ninth Circuit agreed that the user had assented to the tariff terms by unequivocally assenting to UPS's Service Terms. *Id.* at 1080.

Here, the Privacy Policy's incorporation is even more conspicuous than in *Holl*. The Pornhub Terms and Conditions (regardless of when in 2024 or 2025) state in the first section that by using Pornhub, users agree to the Terms "and our Privacy Policy" as

well as other policies and guidelines "incorporated herein by reference."[7] The Terms further not only guide the user to where to find the Privacy Policy, but explicitly hyperlink to it. (*Id.*, Ex. A at 1.) And they specifically provide in the first section that "[i]f you do not agree to any of these Terms of Service or our Privacy Policy, please do not access or use this Website." (*Id.*)[8] That is sufficient to incorporate the Privacy Policy into the Terms and Conditions. *See Holl*, 925 F.3d at 1084; *Freitas v. Cricket Wireless, LLC*, 2022 WL 1082014, at *8 (N.D. Cal. Apr. 11, 2022) (in-store electronic agreement incorporated terms not presented to customers in store where "(1) it referred to the separate Terms and Conditions; (2) it stated that the Terms and Conditions were available online, in phone boxes, and in-store upon request; and (3) it required that consumers sign to acknowledge that they accept defendant's Terms and Conditions (including dispute resolution by binding individual arbitration instead of jury trials or class actions)" (cleaned up)). Plaintiffs' only argument to the contrary is that they would have had to read the terms to which they agreed to know about the Privacy Policy. (*See* Opp'n at 13–14.) But the same was true in *Holl*, where the arbitration agreement at issue was contained in section 52 of the agreement. 925 F.3d at 1081. Because Plaintiffs consented to the Terms and Conditions, which incorporate the Privacy Policy, they consented to the data-collection practices disclosed in the Privacy Policy.

**2. All versions of the Privacy Policy disclose the complained-of data collection and disclosure practices.**

Plaintiffs consented to the Terms and Conditions, which incorporate the Privacy Policy, and thus they consented to the data-collection practices disclosed in the Privacy Policy.

Pornhub's Privacy Policy has stated since at least January 2024 that Pornhub

---

[7] *See* Lisy Decl., Ex. A at 1 (January 31, 2024 version, last updated August 17, 2023); *id.*, Ex. B at 1 (May 1, 2024 version, last updated February 1, 2024); *id.*, Ex. C at 2–3 (May 20, 2024 version, last updated May 2, 2024); *id.*, Ex. D at 2–3 (July 30, 2024 version, last updated May 23, 2024); *id.*, Ex. E at 2–3 (November 28, 2024 version, last updated July 31, 2024); *id.*, Ex. F at 2–3 (January 2, 2025 version, last updated December 2, 2024).

[8] Elsewhere, the Terms also state that "[b]y using this Website, you acknowledge that you have read and understand the terms of the Privacy Policy and that you consent to all actions taken by us with respect to your information in compliance with the Privacy Policy." (*Id.* at 6.)

might collect and disclose: (1) "pages you visit" and "search history" on Pornhub, (Lisy Decl. Ex. P at 1 (February 7, 2024 version, last updated August 17, 2023)[9]); (2) "browser and operating system information," (*id.*); (3) "devices you use to access Pornhub," (*id.*); and (4) that Pornhub uses "Google as a service provider to collect and analyze information about how users use the Website, including, by collecting website activity data through . . . third-party cookies set by Google," (*id.* at 2; *id.*, Ex. Q at 3).[10]

Those disclosures also adequately inform Plaintiffs and users of the specific data collection and disclosure practices of which Plaintiffs now complain. Plaintiffs contend "the only" disclosure Pornhub makes about using data for advertising purposes is that it may use the data about users' "use of, or interest in, our Websites' content, products, or services, in order to develop and display content and advertising tailored to your interests on our Websites." (*See* Lisy Decl. Ex. P at 2; Opp'n at 14 (citing different version of the Privacy Policy, which contains similar language).) But Plaintiffs misinterpret that disclosure (*i.e.*, that the advertising is only on Pornhub) because they ignore basic grammatical rules that "on our Websites" modifies "interests," and not "advertising." *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("[Q]ualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote" (quoting Rule of the Last Antecedent, *Black's Law Dictionary* (12th ed. 2024)). The disclosure is thus not limited to advertising on Pornhub. Moreover, that is not the "only" disclosure, as Plaintiffs allege; Pornhub also states that it uses "Targeting and Advertising cookies" to "serve ads that might be of interest to the user." (*See* Lisy Decl. Ex. P at 2.[11]) Again, those disclosures are not limited to Pornhub. Because Pornhub

[9] The other versions of the Privacy Policy in 2024 contain the same relevant disclosures (save for some changes in terminology from "on the Website" to "Pornhub"). (*Id.*, Ex. Q at 1 (May 20, 2024 version, last updated February 8, 2024; *id.*, Ex. R at 1 (January 4, 2025 version, last updated May 23, 2024).)

[10] The May 23, 2024 version of the Privacy Notice moved this disclosure to the Cookie Notice, incorporated into the Privacy Notice. (*See id.*, Ex. R at 3 (section 7).) The Cookie Notice contains the same disclosure with only some non-substantive spelling changes. (*Id.*, Ex. T at 5 (June 29, 2024 version, last updated May 20, 2024); *id.*, Ex. U at 5 (October 8, 2024 version, last updated July 1, 2024); *id.*, Ex. V at 4–5 (January 4, 2025 version, last updated October 17, 2024).)

[11] Again, the other versions of the Privacy Policy in effect in 2024 contain the same relevant disclosures, save for sometimes changing "the user" with "you." (*Id.*, Ex. Q at 3 (May 20, 2024 version, last updated February 8, 2024; *id.*, Ex. R at 3 (January 4, 2025 version, last updated May 23, 2024, incorporating the

informed Plaintiffs that it might disclose the precise information they now allege was collected and disclosed to third parties -- including to Google -- Plaintiffs consented to the practices of which they now complain.[12]

### C. Plaintiffs' unjust enrichment claim (Count IV) fails because a plaintiff cannot sue in tort and claim unjust enrichment as a matter of law.

Plaintiffs' consent defeats their unjust enrichment claim, but their claim also fails for the independent reason that a party cannot bring an unjust enrichment claim that is duplicative of their tort or statutory claims. *See In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011) ("plaintiffs can not assert unjust enrichment claims that are merely duplicative of statutory or tort claims").[13] Nor can Plaintiffs preserve this claim as a ground to seek restitution. "In California, 'there is not a standalone cause of action for unjust enrichment, which is synonymous with restitution.'" *Silver v. Stripe Inc.*, 2021 WL 3191752, at *8 (N.D. Cal. July 28, 2021).

### D. Plaintiffs once again concede their remaining claims fail.

Despite pleading these claims in the Third Amended Complaint, Plaintiffs once again do not respond to Defendant's arguments explaining why Plaintiffs' claim under New York General Business Law § 349 (Count VII) fail. (*See* Mot. at 20–21.) Nor do they respond to Defendant's argument that there is no common-law invasion of privacy claim under New York law (Count I as to C.P.), or that Plaintiffs' implied-contract claim is not well pled (Count III). (*Id.* at 22, 23–24.) Plaintiffs have thus waived any arguments on these claims, which should be dismissed with prejudice. *See Way*, 2018 WL 1518677, at *6.

## CONCLUSION

Plaintiffs should be compelled to arbitrate while this action is stayed, or their Third Amended Complaint should be dismissed with prejudice and without leave to amend.

---

Cookie Notice); *id.*, Ex. T at 3 (June 29, 2024 version of Cookie Notice, last updated May 20, 2024); *id.*, Ex. U at 3 (October 8, 2024 version of the Cookie Notice, last updated July 1, 2024); *id.*, Ex. V at 3 (January 4, 2025 version of the Cookie Notice, last updated October 17, 2024).)

[12] Plaintiffs offer no legal support for their argument that these claims survive as they relate to TrafficJunky. (*See* Opp'n at 22 n.15.)

[13] Plaintiffs do not dispute this principle applies under New York law. *Way v. JP Morgan Chase Bank, N.A.*, 2018 WL 1518677, at *6 (E.D. Cal. Mar. 28, 2018) (dismissing claim with prejudice where plaintiff failed to respond to arguments when opposing to motion to dismiss).

DATED: April 17, 2026

Respectfully submitted,

By: */s/ Christoper A. Lisy*

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
Christopher A. Lisy (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
CALisy@mintz.com

Nada I. Shamonki
Nadia A. Zivkov
2049 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone: (310) 586-3200
NIShamonki@mintz.com
NAZivkov@mintz.com

Seth R. Goldman (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Telephone: (212) 935-3000
SRGoldman@mintz.com

*Attorneys for Defendant Aylo Freesites Ltd*